E. MARTIN ESTRADA
United States Attorney

PETER J. ANTHONY (NY Bar No. 4940912)
ERIKA V. SUHR (FL Bar No. 1020532)
Trial Attorneys, Tax Division
COREY SMITH (MA Bar No. 553615)
Senior Litigation Counsel, Tax Division
150 M Street NE
Washington, DC 20002
Telephone: (202)616-5263
Email: peter.j.anthony@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE GRAND JURY INVESTIGATION | CR Misc. No. 2:24-CM-00169<br><br>EX PARTE APPLICATION FOR AN ORDER SUSPENDING OF THE RUNNING OF THE STATUTES OF LIMITATIONS PURSUANT TO 18 U.S.C. § 3292; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF IRS SPECIAL AGENT ERROL WATSON; AND[PROPOSED] ORDER<br><br>**[UNDER SEAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 6(e)]** |

## I.   INTRODUCTION

The United States of America, by and through its counsel of record, hereby applies ex parte, in camera, and under seal for an order pursuant to 18 U.S.C. § 3292[1] suspending the running of the

---

[1] Title 18, United States Code, Section 3292(a)(1) provides in summary that upon application of the United States indicating that evidence is in a foreign country, the district court shall suspend the running of the statute of limitations for the related offense(s) if the court finds that an official request has been made for the evidence and it reasonably appears that the evidence is in such foreign country.

statutes of limitations for certain offenses that are presently under investigation in the Central District of California.

## II.   CRIMES UNDER INVESTIGATION AND FOREIGN EVIDENCE

A grand jury impaneled in the Central District of California is investigating Nigel Sinclair, Anthony Stewart and others concerning whether since 2000, Sinclair has conspired with others to conceal income and assets offshore for the purpose of evading taxes.  The grand jury investigation includes possible violations of federal law including conspiracy to defraud the United States in violation of 18 U.S.C. Section 371; mail fraud, in violation of 18 U.S.C. Section 1341; wire fraud, in violation of 18 U.S.C. Section 1343; money laundering, in violation of 18 U.S.C. Section 1956;  tax evasion, in violation of 26 U.S.C. Section 7201; willful failure to file a return, in violation of 26 U.S.C. Section 7203; willfully making and subscribing a false return, in violation of 26 U.S.C. Section 7206(1); corruptly endeavoring to obstruct or impede the due administration of the Internal Revenue Code, in violation of 26 U.S.C. Section 7212(a); willful failure to file a report, or willful filing of a false report, of foreign bank account, in violation of 31 U.S.C. Sections 5314, 5322, tampering with a witness in violation of 18 U.S.C. Section 1512, and obstruction of proceedings before departments or agencies of the United States in violation of 18 U.S.C. Section 1505.

As part of this investigation, the government has made the following requests to foreign authorities for records relevant to the offenses under investigation:

1.    On August 19, 2019, the United States made a formal request for foreign evidence to the Government of Australia.  A copy of the cover letter transmitting the request is attached as Exhibit A1. As of the date of this motion, the United States has not received its final response from Australia.

2.    On February 8, 2018 the United States made a formal request for foreign evidence to the United Kingdom.  A copy of the cover letter transmitting the request is attached as Exhibit B.  The United Kingdom provided its final response no earlier than March 8, 2022 when the requested interview of Guy East took place.

Accordingly, the United States now asks the Court to suspend the running of the statutes of limitations for the offenses under investigation subject to the limitations period provided by 18 U.S.C. § 3292(c) based on the periods identified above.

In order to prevent the target of the investigation from learning of the progress of the investigation and the foreign evidence requests, as well as to preserve the secrecy of information obtained by the grand jury, the government moves to file this Application, the Memorandum of Points and Authorities, the Declaration of IRS Special Agent Errol Watson, and the exhibits thereto, as well as the Proposed Order, ex parte, in camera, and under seal, and asks the Court to review all of the foregoing documents in camera. Further, the United States requests that this Court's Order be placed under seal, except that certified copies of the Application, the Memorandum of Points and Authorities, the Watson Declaration, the Exhibits thereto, and this Court's Order be provided

1   to the Office of the United States Attorney for the Central District

2   of California.

3    Dated: August 28, 2024              Respectfully submitted,

4

5                                        E. MARTIN ESTRADA
                                         United States Attorney

6

7                                        */s/ Peter J. Anthony*

8                                        PETER J. ANTHONY
                                         ERIKA V. SUHR

9                                        Tax Division, Trial Attorney

10                                       COREY SMITH
                                         Tax Division, Senior Litigation

11                                       Counsel

12
                                         Attorneys for Plaintiff
13                                       UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.  INTRODUCTION AND FACTS

For more than two decades, Nigel Sinclair and Guy East[2], Cambridge- and Exeter University-educated attorneys respectively, were clients of Strachans, N.A., a Swiss accounting firm.  Strachans – which pled guilty before this Court to conspiring to defraud the United States in 2020 – was in the business of facilitating tax evasion for its clients.  (Watson Decl. ¶ 4(c).) Clients, such as Sinclair and East, would turn over on-paper control of their assets to Strachans who would hold, invest, and move their assets through a complex web of foreign companies and trusts.  (*Id*.) Despite whatever the documents said, everyone understood that whatever funds Strachans held, it held them as nominees for its clients.  (*Id*.)

1.  <u>Sinclair Leaves the Law and Creates Intermedia, a Movie Company with Producer Guy East.</u>

Sinclair was an entertainment lawyer and named partner at a boutique law firm in Los Angeles when he met his then client, Guy East. (*Id.* ¶4(a).) Sinclair left the practice of law in 1996 when he and East went into business together and formed Intermedia, a film production company, Intermedia Films.  (*Id*.)  East and Sinclair have worked together ever since as 50-50 partners.  (*Id*.)  Sinclair and East retained Strachans, along with Australian accountant Anthony Stewart, to structure the ownership of Intermedia.  (*Id*. ¶4(b).) East and Sinclair each owed 25% of the company in their own name. (*Id*. ¶4(d).)  A Maltese company, Hornbeam Holdings, owned the remaining 50%.  (*Id*.)  On paper, Hornbeam appeared to be owned at

---

[2] Sinclair is a citizen of both the United States and the United Kingdom. Guy East is a citizen of the United Kingdom.

times by Stewart or Philip Egglishaw, a partner at Strachans who managed Sinclair and East's affairs. (*Id*.) But in reality, Egglishaw and Stewart were mere strawman, holding the Hornbeam Intermedia stock for East and Sinclair in equal share. (*Id*. ¶4(e).) Sinclair and East thus sheltered fifty percent of their ownership interest, and any resulting income, offshore. (*Id*.)

Intermedia quickly found success and produced several hit films. (*Id*. ¶4(f).) After merging with another company, Intermedia went public on a German stock exchange in May 2000, achieving a market valuation of over $1 billion. (*Id*.) Sinclair and East sold their own Intermedia shares and reported and paid tax on them. (*Id*. ¶4(g).) Sinclair and East also sold Hornbeam's Intermedia shares, which netted them approximately $50 million, but deposited these proceeds into Swiss bank accounts owned by foreign trusts established by and controlled by Strachans. (*Id*.) Each deposited approximately $25 million. (*Id*. ¶4(h).) Neither reported those sales to their respective taxing authorities nor paid any tax on the gains they had earned. (*Id*.) Sinclair thus avoided nearly $4 million in capital gains taxes by utilizing Strachans' offshore shelter. (*Id*.)

Sinclair's newly found $25 million fortune did not just sit hidden in bank accounts in Switzerland. (*Id*. ¶4(i).) Through Strachans, and managed by Stewart, Sinclair and East opened brokerage accounts in the U.S. and the U.K. and invested tens of millions into securities. (*Id*.) Sinclair reported none of the millions in interest or capital gains he earned over the years from these investments. (*Id*.) Stewart advised East and Sinclair on how to invest their money. (*Id*. ¶ 4(j).) He would meet with them several

6

times a year and provide them information about the return on their
investments. (*Id.*).

East and Sinclair left Intermedia only a few years after it went
public. (*Id.* ¶4(k).) They founded a new U.S.-based movie production
company called Spitfire Pictures, which they again financed through
several British Virgin Island ("BVI") dummy entities including
Strachans-owned company George Square Trading Limited ("George
Square"). (*Id.*) The money used to fund Spitfire came from the
untaxed Intermedia funds and on paper would appear to have come from
Strachans. (*Id.*) George Square was styled as a "private investor"
that held 60% of Spitfire. Stewart acted as the representative of
George Square. But in reality, this interest was held by George
Square solely as a strawman for East and Sinclair. (*Id.* ¶ 4(l).)
Sinclair did not report that ownership interest, and associated
income to the IRS. (*Id.*)

George Square further served as an untaxed personal expense
account for both Sinclair and East.[3] For instance, Sinclair, an avid
musician, purchased over a million dollars' worth of guitars and rock
and roll memorabilia at auction, including a guitar previously owned
by Eric Clapton, using George Square as the straw purchaser to pay
for it. (*Id.* ¶ 4(m).) For years, Sinclair kept these guitars in his
office or home, showing them off to visitors. (*Id.* ¶ 4(n).) George
Square funds were also used by Sinclair to fly on private jets, and
Sinclair possessed and used a credit card issued in the name of
George Square. (*Id.*)

---

[3] East is an avid golfer. George Square purchased East
membership in two of London's most exclusive's golf clubs and paid
for East to enter high level golf tournaments, all under the guise of
networking.

7

In or about 2003 Sinclair turned to Strachans to help him use his offshore fortune to purchase land in Jackson Hole, Wyoming to build his "dream house." (*Id.* ¶4(o).) On paper, however, it would appear that Strachans at Stewart's request had provided the funds to build Sinclair's dream vacation home. (*Id.*) Strachans funneled Sinclair's money through a BVI company called Wabuska Ltd., to Sinclair's business manager's client trust account. (*Id.*) From there, it was wired to two Delaware corporations, then to two Delaware LLCs and then to its final destination for the purpose of building Sinclair's home. (*Id.*) In all, Sinclair used $11.5 million of his offshore money to fund the purchase of two parcels of land and the construction, furnishment, and decoration of an over 8,000 square foot mansion. (*Id.* ¶ 4(p).) Sinclair invested a significant amount of time on the construction and design of his Jackson Hole "dream home," although his name does not appear on any of title or ownership documentation. (*Id.*) The Jackson Hole home was built to Sinclair's, and his family's, specifications, complete with a music studio for him and "Pat's loft" for his wife, Patricia. (*Id.*) There is no evidence that anyone other than Nigel and Pat Sinclair directed the design, construction, or furnishment of the Jackson Hole home. There is no evidence that any corporate directors, trustees, or anyone from Strachans exercised any control over this project. (*Id.* ¶ 4(q).).

2.  Project Wickenby Causes Sinclair and East to Try and Restructure Their Affairs.

In 2004, Philip Egglishaw was arrested in Australia and his laptop, which contained gigabytes of client data, was seized. (*Id.* ¶ 4(r).) From the documents it seized, the Australian government launched the largest tax evasion investigation in its history, code-

named Project Wickenby.[4]  (*Id.*) Neither being Australian, Sinclair and East were not initially targeted.  (*Id.*) As the investigation progressed, however, it became clearer and clearer that Australia had identified them, was developing evidence that involved them, and could share such information with its partners, including the United States and the United Kingdom. (*Id.* ¶ 4(s).)

   Thus, over the years, Sinclair and East tried to distance themselves and their fortunes from the investigation. (*Id.* ¶4(t).) East relocated from London to Monaco where he could act as a nominee for Sinclair. (*Id.*) They transferred ownership of the Jackson Hole property into East's name.  (*Id.*) They restructured their offshore affairs to create more on-paper separation between themselves and Strachans. (*Id.*)  They reviewed and destroyed potentially damaging Strachans files.  (*Id.*)

   As Australia's investigation continued to spill into the daylight, however, Sinclair and East terminated all their formal affiliation with Strachans and moved their remaining offshore money into the hands of Richard Egglishaw, Phillip Egglishaw's brother and another Strachans partner. (*Id.* ¶4(v).)  Indeed, on November 7, 2007, the bulk of East's and Sinclair's remaining offshore money on deposit with Strachans was transferred to bank accounts at UBS in Switzerland.  (*Id.*) Bank records show that on November 7, 2007, £22,499,000 was transferred from a Strachan's entity bank account to a UBS bank account in the name of Gold Paterson Technology Ltd, a company over which Richard was the sole owner.  (*Id.* ¶4(x).)  Within a few days, the money was split and

_____

[4] As a result of Project Wickenby, Australia charged 76 people with tax crimes and recovered AUD$985.67 million in unpaid tax. *See* https://www.ato.gov.au/General/The-fight-against-tax-crime/News-and-results/Project-Wickenby-results/.

£6,000,000 was transferred to Penville Global Ltd, another company owned and controlled by Richard. (*Id.*) Penville Global held Sinclair's money; and Gold Paterson held East's money. (*Id.*)

From 2007 through at least 2015, all of Sinclair's and East's UBS funds remained in Gold Paterson and Penville. (*Id.* ¶4(y).) By the end of 2015, the balance of the Penville account was £8 million. (*Id.* ¶4(z).) The only withdrawals from these accounts were for Richard's fees which he stopped collecting altogether in late 2014. (*Id.*)

### 3. East and Sinclair File Disclosures with Their Respective Taxing Authorities

The entire time Sinclair's and East's money was sitting in UBS in Geneva and Credit Suisse in Monaco, the IRS and Her Majesty's Customs & Revenue ("HMRC"), the English equivalent of the IRS, were offering taxpayers with hidden, untaxed, offshore assets, amnesty if they voluntarily reported their holdings and came into compliance with their tax obligations.[5] (*Id.* ¶ 4(aa).) However, Sinclair and East did not take advantage of this opportunity until 2014. (*Id.*)

In August 2014, East was forced to move back to London when his wife, who still lived in London, was diagnosed with cancer. (*Id.* ¶ 4.bb) He thus gave up the shield against taxation by the U.K. and the U.S., respectively, that being a Monaco resident provided for him and Sinclair. (*Id.*) East quickly retained U.K. counsel and started preparing his voluntary disclosure to the U.K. taxing authorities. Sinclair followed suit. (*Id.*)

In November 2015, East filed a disclosure pursuant to the U.K.'s

---

[5] The IRS program is called the OVDP, or Offshore Voluntary Disclosure Program.

Liechtenstein Disclosure Facility ("LDF") which was a process whereby U.K. citizens with unreported bank accounts in Liechtenstein could declare those undisclosed assets to HRMC. (*Id.* ¶ 4(cc).) A taxpayer could claim that they had exercised reasonable care or been careless to reduce the look-back period from fifteen years to four or six years respectively, but East decided to do neither and came clean, subjecting himself to the program's highest penalties. (*Id.* ¶ 4(dd).)

On October 7, 2015, Sinclair filed a Streamlined Offshore Voluntary Disclosure, attaching: two statements; amended returns for tax years 2011, 2012, and 2013; amended FBARs for years 2009, 2010, and 2011; and original FBARs for years 2012, 2013, and 2014. (Id. ¶ 4(ee).) As part of the October 7, 2015 Streamlined filing, and in his amended tax returns, Sinclair averred under penalty of perjury that the information he provided to the IRS was complete and accurate. (*Id.* ¶ 4(ff).)

For each year included in Sinclair's Streamlined Disclosure, Sinclair was required to list his previously undisclosed foreign accounts, their account balances, and aggregate them. (*Id.* ¶ 4(gg).) The penalty for previously failing to disclose these foreign bank accounts is calculated based on that aggregated amount and yearly account balance. (*Id.*) Sinclair only reported (and paid a penalty on) two offshore assets – his ownership of Virtual Graphics formerly known as Wabuska, the BVI entity through which Sinclair owed his Jackson Hole vacation home, and his collector's Eric Clapton guitar. (*Id.* ¶4(hh).) Based on these two disclosures, Sinclair paid $457,000 in penalties. (*Id.*) He reported no additional tax for 2011, 2012 or

2013.  (*Id.*)

Sinclair claimed in a statement attached to his 2015 Streamlined disclosure that he did not have enough information to disclose the UBS account because he believed that Strachans had, in essence, stolen the money. (*Id.* ¶4(ii).)  With regard to the FBARs, Sinclair gave a similar narrative, attributing his previous failure to file to "a combination of his negligence, lack of knowledge of applicable tax forms, mistakes of law as to his reporting obligations, and his good faith understanding of the same." (*Id.* ¶4(jj).).

**II.  FOREIGN EVIDENCE REQUESTS**

The United States made requests to the United Kingdom and the Government of Australia.  Each will be addressed in turn.

    **A.    Request to the United Kingdom**

On February 8, 2018 the United States made a formal request for foreign evidence to Her Majesty Revenue and Custom.  A copy of the cover letter transmitting the request is attached as Exhibit B.  The request seeks foreign evidence relevant to the Sinclair investigation from English authorities pursuant to the Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and on Capital Gains. See id..  The request sought Guy East's disclosure to the UK government, any documents he submitted to the government as part of his disclosure. *See* Watson Decl. ¶ 11. The request also stated that a request to interview East may be forthcoming after the United States received the requested documents.  (*Id.).* The U.K. government responded on May

3, 2018 and September 27, 2018 with a summary of East's disclosure but not the actual disclosure or any of the supporting documentation. The United States followed-up with a request to interview East on September 4, 2019.  Watson Decl. ¶ 12.  The interview was conducted on March 8, 2022.

**B.    Request to the Government of Australia**

On August 19, 2019, the United States made a formal request for foreign evidence to the Central Authority of Australia.  A copy of the cover letter transmitting the request is attached as Exhibit A1. The request seeks foreign evidence relevant to the Sinclair investigation from Australian authorities pursuant to an agreement and Convention between the United States and Australia.  See Exhibit B.  The request seeks, among other things, the following evidence believed to be in Australia.  See Watson Decl. ¶ 5.

1.   Evidence related to Silverstream Management PTY LTD's representation of Nigel Sinclair, including bank records and wire transfer records.

2.   Evidence of Silverstream Management PTY LTD's corporate records.

3.   Anthony Stewart's testimony regarding his role in the Sinclair and Strachans scheme to conceal Sinclair's foreign financial activity from the IRS.

On January 24, 2021, Australia responded and provided corporate records for Silverstream. It noted that due to the passage of time, probable cause to serve a search warrant on Silverstream had grown stale.  The Australian authority then requested advice on whether they should approach Anthony Stewart to see if he would agree to a

voluntary interview.  After discussions between the two governments, on January 11, 2022, the United States made a formal supplemental request for foreign evidence to the Central Authority of Australia pursuant to an agreement and Convention between the United States and Australia.  *See* Exhibit B.1.  The request sought a Statement of Facts regarding Anthony Stewart prepared by the Australian Crime Commission which was believed to be in Australia. The Australian authorities responded to the supplemental request on March 8, 2022.

On February 14, 2022, the Australians provided additional materials related to the United States' original request. A copy of the transmittal letter is attached as Exhibit A.2.

On September 27, 2022, the United States renewed its initial request and made a formal second supplemental request for foreign evidence to the Central Authority of Australia pursuant to an agreement and Convention between the United States and Australia. *See* Exhibit A.3.  In the second supplemental request, the United States requested bank records for additional entities wherein Anthony Stewart may have acted as an advisor and intermediary for Sinclair.

The Australian authorities have not taken final action on the United States' second supplemental request for foreign evidence in this case and the final production of the requested information has not been delivered to United States authorities. The requested interview of Anthony Stewart made in the original request has not taken place.

**III. APPLICABLE LAW**

    A. <u>Section 3292 Requires Suspension of the Statute of Limitations When Foreign Evidence is Sought.</u>

    18 U.S.C. § 3292 provides that a court shall suspend the running

of the statute of limitations on offenses for a period of up to three years when an official request has been made for relevant evidence in a foreign country. Section 3292 provides in relevant part:

> (a) (1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.
>
> . . . .
>
> (b) . . . a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.
>
> (c) The total of all periods of suspension under this section with respect to an offense-
>
>> (1) shall not exceed three years; and
>>
>> (2) shall not extend a period within which a criminal case may be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.
>
> (d) As used in this section, the term "official request" means a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country.

18 U.S.C. § 3292

Section 3292 contains two temporal requirements: (1) that the official request for evidence in a foreign country be made before the statute of limitations expires on any charges ultimately charged; and (2) that the application for suspension be submitted to the district

1    court before the indictment is filed. United States v. Jenkins, 633

2    F.3d 788, 799 (9th Cir. 2011) (citations omitted).

3         "Evidence" as used in § 3292(a)(1) is broader than admissible,

4    documentary evidence unobtainable in the United States and essential

5    to bringing charges against the target of the investigation. United

6    States v. DeGeorge, 219 F.3d 930, 937 (9th Cir. 2000) ("DeGeorge I")

7    ; United States v. DeGeorge, 380 F.3d 1203, 1213 (9th Cir. 2004)

8    ("DeGeorge II"). Section 3292 requires the government only to

9    establish that "evidence of an offense," not evidence essential to

10   bringing charges on an offense, is "in a foreign country." DeGeorge

11   I, 219 F.3d at 938. Thus, under the broad definition of "evidence" in

12   the context of a grand jury investigation, the foreign evidence

13   sought by the government can include testimony, documents, and

14   tangible objects (even if inadmissible) that tend to prove or

15   disprove the existence of an alleged fact. Id. at 937-38.

16        The phrase "if the court finds by a preponderance of the

17   evidence" in § 3292 means that "the government has some burden to

18   establish, as opposed to being able merely to assert without support,

19   that the foreign evidence it seeks meets the [statute's]

20   requirements." Id. at 937.

21        To satisfy its evidentiary burden, the government must provide

22   something with evidentiary value—that is, testimony, documents,

23   proffers, and other submissions bearing some indicia of reliability—

24   tending to prove it is reasonably likely that evidence of the charged

25   offenses is in a foreign country. Jenkins, 633 F.3d at 798 (citation

26   omitted). A sworn declaration describing an IRS investigation, the

27   grand jury's investigation, and the evidence already recovered

28

16

1  tending to indicate that further evidence of the offenses is abroad

2  satisfies the government's burden. Id.

3      In order to toll the statute of limitations, the request for

4  evidence must be reasonably specific in order to elicit evidence of

5  the alleged violations under investigation by the grand jury. United

6  States v. Neill, 952 F. Supp. 831, 833 (D.D.C. 1996) (holding that

7  official request seeking foreign evidence relating to money

8  laundering, conflicts of interest, bribery or gratuity, and foreign

9  financial transactions, including bank records, was reasonably

10 specific to elicit evidence probative of tax violations then under

11 investigation by grand jury; tolling statute of limitations for tax

12 offenses).

13      The section 3292 toll is offense-specific not person-

14 specific, so a foreign evidence request does not need to specifically

15 identify a defendant to toll the statute against them.  United States

16 v. Michel, 2019 WL 5797669, at *9 (D.D.C. Nov. 6, 2019); United

17 States v. Carson, 2009 WL 10793919, at *2 (C.D. Cal. Dec. 8, 2009);

18 United States v. Ratti, 365 F. Supp. 2d 649, 656 (D. Md. 2005);

19 United States v. Neill, 952 F. Supp. 831, 832 (D.D.C. 1996).  Courts

20 have found that the toll applies to charges even if they are not

21 listed in the request for evidence or the tolling order.  E.g. Neill,

22 952 F. Supp. at 832.  It applies to all charges under investigation

23 by the grand jury or those that are "intimately related to the

24 general scheme . . . under investigation," Ratti, 365 F. Supp. 2d at

25 656 (holding statute was tolled under section 3292 for wire fraud

26 charges even though they were not referenced in the MLAT or the

27 tolling application); see also United States v. Swartzendruber, 2009

28

WL 485144, at *5 (D. N.D. Feb. 25, 2009) (tax fraud intimately related to crimes under investigation and thus the toll extended to them).

**A.  A § 3292 Order Suspends the Statute of Limitations from the Date that the Foreign Evidence Request Was Made to the Date When the Foreign Government Takes Final Action on the Request**

The starting date for suspending the limitations period is the date the foreign evidence request was made, not the date the § 3292 application was made or granted. § 3292(b); <u>Jenkins</u>, 633 F.3d at 799; <u>United States v. Bischel</u>, 61 F.3d 1429, 1434 (9th Cir. 1995); <u>United States v. Miller</u>, 830 F.2d 1073, 1076 (9th Cir. 1987).

The ending date for suspending the limitations period is the date on which the foreign government takes final action on the request. § 3292(b). "Final action" means a dispositive response to each item set out in the official request, including a request for certification. <u>Jenkins</u>, 633 F.3d at 800; <u>United States v. Hagege</u>, 437 F.3d 943, 955-56 (9th Cir. 2006); <u>Bischel</u>, 61 F.3d 1429 at 1433-34 (holding that where official request asked for documents and a certification of authenticity of those documents, "final action" occurred when there was a dispositive response by the foreign sovereign to both the request for records and for a certification of authenticity of those records).

When the request is that a particular person be interviewed, courts have held that "final action" occurs when the person is interviewed. <u>See</u> <u>United States v. Weiss</u>, 588 F. Supp.3d 622, 627 (E.D. Pa. 2022); <u>United States v. Minter</u>, 45 F. Supp. 3d 1390, 1399 (N.D. Ga. 2014) (no final action when foreign government interviewed five of the six people requested); <u>United States v. Trainor</u>, 277 F.

Supp. 2d 1278, 1284 (S.D. Fla. 2003) ("here was no 'final action' by Switzerland in this case prior to the return of the indictment because OIA requested that Mr. Schweitzer be interviewed, and that was not accomplished until February of 2002."). Indeed, pegging "final action" to disposition, up or down, of each of the items in the official request provides a more certain benchmark by which to measure whether the action that has been taken is "final" or not. Bischel, 61 F.3d at 1434.

The time period of suspension is not unlimited. The total of all periods of suspension with respect to an offense cannot exceed three years. § 3292(c)(1). Additionally, if the foreign authorities take final action on the request before the expiration of the original statute of limitations period, a § 3292 order can only extend the limitations period for a maximum of six months. § 3292(c)(2).

## IV.  ARGUMENT

### A.  The Government Has Established that Evidence of Tax Offenses Being Investigated by the Grand Jury Was in Australia and the United Kingdom and that the Government Made Official Requests for Such Evidence.

The government's application satisfies all the requirements of § 3292 in order to suspend the statutes of limitations for the offenses that are the subject of the grand jury's ongoing investigation.

The instant application, which is supported by a sworn declaration outlining evidence gathered in the grand jury investigation, establishes by a preponderance that it was reasonably likely that evidence of the offenses under investigation was in Australia and the United Kingdom at the time the respective requests for assistance were submitted.  Specifically, the application provides evidence that Sinclair conspired with Stewart, an

19

Australian, and East, a Briton, to defraud the United States. East, who was Sinclair's business partner was also a client of Strachans who used it for the same purposes and from pooled money from the same source. Similarly, Sinclair relied on the services of Australian Anthony Stewart in his scheme. Stewart acted as Sinclair's frontman for certain assets and as his financial advisor on others. Stewart's records were thus probative to the investigation.

In addition, the government made official requests for foreign evidence to Australia and the U.K. In each instance, the government requested evidence either pursuant to a treaty or an agreement with a foreign country. See 18 U.S.C. § 3292(d).

The application also complies with the two temporal requirements of Jenkins. See 633 F.3d at 799. First, no indictment has been returned in this grand jury investigation. Second, the official requests for evidence were all made prior to the dates on which the statutes of limitations for the offenses under investigation would have otherwise expired.

The statute of limitations for the tax offenses under investigation is six years. See 26 U.S.C. § 6531. The statute of limitations for conspiracy to defraud the IRS under 18 U.S.C. § 371 ("Klein-conspiracy") is six years. *See* 26 U.S.C. § 6531(2); *see also United States v. Wanland*, 830 F.3d 947, 955 (9th Cir. 2016) (tax offenses "involving the defrauding or attempting to defraud the government have a six-year statute of limitations.") A charge under § 7206(1) has a six-year statute of limitations from when the false return was filed. 26 U.S.C. § 6531(5). Sinclair's streamlined offshore voluntary disclosure and related amended tax returns were

1  filed with the IRS on October 7, 2015, and so the statute of

2  limitations for these charges would not have otherwise expired until

3  October 7, 2021. By that date, the United States had not received

4  final responses to either its UK or Australia foreign requests.

5  Thus, as to these charges, the six-month limitation period of section

6  3292(c)(2) does not apply.

7       The statute of limitations for FBAR charges in violation of 31

8  U.S.C. § 5322 is 5 years and runs from the due date of the required

9  FBAR, which is April 15 of the following year. *See* 18 U.S.C. § 3282;

10  *United States v. Lowry*, 409 F. Supp. 2d. 732, 740-41 (W.D. Va. 2006).

11  FBARs related to Sinclair's offshore accounts for 2016 and 2017 due

12  April 15, 2017 and April 15, 2018 respectively would have not

13  otherwise expired until April 15, 2022 and April 15, 2023

14  respectively.  By those dates, the United States had not received a

15  final response to its requests from Australia and thus the six-month

16  limitations period of section 3292(c)(2) does not apply.

17                              * * *

18       Accordingly, the Court should find that it reasonably appeared

19  that evidence concerning the offenses described herein was in

20  Australia and the United Kingdom, and that appropriate requests for

21  foreign evidence were made prior to the expiration of the statutes of

22  limitation for the Target Offenses. Therefore, the Court should grant

23  the government's application suspending the statutes of limitations.

24       A. In Camera and Under Seal Filing of This Application Is
            Proper

25       The government has filed this Application in camera and under

26  seal because it relates to an ongoing grand jury investigation and

27  contains confidential and sensitive information. Fed. R. Crim. P.

28                               21

6(e)(6).

Filing this application ex parte, in camera and under seal is supported not only by Rule 6(e)(6), but also by Ninth Circuit case law concerning § 3292. In DeGeorge I, 219 F.3d at 937, the Ninth Circuit rejected an argument that an ex parte and in camera application made under § 3292 is invalid. The court noted that § 3292 refers to an "application of the United States" and not a "noticed application," adding that "[n]owhere in the section does it state that the party whose statute of limitations is being suspended is entitled to notice or a hearing." Id. The court also noted that not allowing a party to appear and present evidence in opposition to a § 3292 application "would be to follow the traditionally non-adversarial and secret nature of grand jury investigations," which the court characterized as "unique . . . in the criminal justice system." Id. Accordingly, this Application is filed ex parte, in camera, and under seal. The Court may properly consider this Application in camera.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court enter the proposed order lodged concurrently herewith, suspending the running of the statutes of limitations for the Target Offenses for the dates as described in the proposed order.

Dated: 08/28/2024                    Respectfully submitted,

                                     E. MARTIN ESTRADA
                                     United States Attorney

                                     /s/ Peter J. Anthony
                                     PETER J. ANTHONY
                                     Tax Division, Trial Attorney